**Affirmed and Opinion filed August 29, 2019.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00476-CV

**MEMORIAL HERMANN HEALTH SYSTEM, INDIVIDUALLY AND D/B/A MEMORIAL HERMANN-KATY HOSPITAL; MIKAEL LUCAS, M.D.; MIKAEL LUCAS, M.D., PLLC; RANDOLPH WHITFORD, M.D.; AND EYES OVER TEXAS EYE CARE P.A., Appellants**

**V.**

**DONNIE HEINZEN, Appellee**

On Appeal from the 129th District Court
Harris County, Texas
Trial Court Cause No. 2017-33241

## O P I N I O N

Under the Texas Medical Liability Act ("the Act"),[1] a medical-negligence claim is subject to dismissal on the motion of the defendant physician or health-care provider if the claimant fails to timely serve reports by qualified experts opining that

---

[1] TEX. CIV. PRAC. & REM. CODE ANN. § 74.001–.507.

the defendant's breach of the applicable standard of care caused the harm alleged. Appellee Donnie Heinzen brought medical-negligence claims after she suffered permanent vision loss from acute angle-closure glaucoma, and she alleges that the damage would have been minimal and reversible but for the breaches of the respective standards of care by a hospital's emergency-room nurses, an emergency-room doctor, and the ophthalmologist who examined her in the hospital. The various defendants challenged some or all of Heinzen's four expert reports, and the trial court denied their respective motions to dismiss.

On appeal, the defendants argue that the trial court improperly gave Heinzen three 30-day extensions to serve the required expert reports rather than the single 30-day extension authorized by the Act, and that the trial court improperly considered expert reports served after the initial extension expired. Some defendants also challenge the qualifications of a given report's author and the adequacy of the reports themselves.

We conclude that the trial court did not give Heinzen a 30-day extension from the date of the oral hearing on the defendants' objections as they contend, and that each of the trial court's three signed orders granted Heinzen a 30-day extension, beginning from the date the order was signed, to cure the original expert report's deficiencies concerning the defendant or defendants named in the order. We further conclude that Dr. David Tasker was qualified to render the expert opinions he expressed, and that his opinion or opinions applicable to each defendant before us satisfied the Act's requirements. We accordingly affirm the trial court's orders denying the motions to dismiss.

## I. BACKGROUND

Heinzen contends that she sought treatment for angle-closure glaucoma from physicians and health-care providers Dr. Mikael Lucas and Mikael Lucas M.D.,

2

PLLC (collectively, "Dr. Lucas");[2] Memorial Hermann Health System d/b/a Memorial Hermann–Katy Hospital ("Memorial Hermann"), and Dr. Randolph Whitford.[3] According to the allegations in Heinzen's petition, these individuals and entities, whom we refer to collectively as "the Providers," failed to timely recognize and treat Heinzen's angle-closure glaucoma, and the delay in treatment caused permanent damage to Heinzen's retina and loss of her visual field.

After Heinzen served the Providers with the original expert report and curriculum vitae of board-certified ophthalmologist Dr. David I. Tasker, the Providers timely objected to the report's sufficiency. Memorial Hermann and Dr. Lucas additionally objected that Dr. Tasker was not qualified to render an expert opinion. All of the Providers contend that at the December 11, 2017, hearing on their objections, the trial court orally granted Heinzen a 30-day extension—that is, until January 10, 2018—to supplement her expert report. Heinzen served no supplemental expert reports by that date.

On January 24, 2018, the trial court signed two orders, each of which granted Heinzen a 30-day extension to cure any defects in the expert report. The two orders differ only in that one order recites that the trial court considered Memorial Hermann's "Objections to Plaintiff's Expert Report, the response, and the arguments of counsel," and the other substitutes Dr. Whitford's name for Memorial Hermann's. Thirty days after the trial court signed the orders, Heinzen supplemented Dr.

---

[2] Both at trial and on appeal, the parties have included Dr. Lucas's professional limited-liability company in their references to Dr. Lucas as an individual, and we do likewise.

[3] Heinzen also alleged that other individuals and entities were medically negligent, but the case before us concerns only the objections and motions to dismiss of Dr. Lucas, Memorial Hermann, and Dr. Whitford. Although Eyes Over Texas Eye Care P.A. purports to join in Dr. Whitford's brief, that entity did not object to any expert report, move to dismiss the claims against it, or file a notice of appeal. Thus, unlike Dr. Lucas's company, Eyes Over Texas Eye Care P.A. is not a party to this proceeding.

Tasker's original expert report with a second report by Dr. Tasker and with the report and curriculum vitae of Dr. Lige B. Rushing Jr., who is board-certified in internal medicine, rheumatology, and geriatrics. Both of Dr. Tasker's reports address the conduct of all of the Providers, but Dr. Rushing offered no opinion regarding Dr. Whitford.

The Providers objected that these supplemental reports served on February 23, 2018, were untimely and could not be considered. Drs. Whitford and Lucas also objected that Dr. Tasker's second report did not adequately address the standard of care, breach, and causation, and Dr. Lucas repeated those objections as to Dr. Rushing's report. Memorial Hermann reurged its objection to Dr. Tasker's qualifications and objected that both of the February 2018 reports contained conclusory opinions of causation. All of the Providers moved for dismissal of the respective claims against them.

On February 28, 2018, the trial court signed a third order granting Heinzen a 30-day extension. It is identical to the trial court's two previous orders except that the Provider named is Dr. Lucas. On March 30, 2018, Heinzen served the parties with a second report by Dr. Rushing. This report was directed only to the alleged negligence of Dr. Lucas and to Dr. Rushing's qualifications to opine on that issue. Dr. Lucas again objected and moved for dismissal.

The trial court overruled all objections to the supplemental expert reports and denied the Providers' respective motions to dismiss. The Providers bring this interlocutory appeal challenging those rulings.

## II. ISSUES PRESENTED

All of the Providers argue in their first issue that the trial court abused its discretion by giving Heinzen three 30-day extensions to supplement her expert

4

report and by considering untimely reports. Memorial Hermann also asserts in its second issue that Dr. Tasker is not qualified to render an expert opinion regarding the conduct of the nursing staff, and that the reports of Drs. Tasker and Rushing are conclusory as to causation. In his second issue, Dr. Lucas challenges both experts' qualifications and argues that their reports do not adequately address the applicable standard of care, breach, or causation.

### III. TIMELINESS OF THE SUPPLEMENTAL EXPERT REPORTS

A claimant under the Act must serve an expert's report and curriculum vitae upon each defendant within 120 days after the defendant answers the suit. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). The defendant must file and serve any objections to the report's sufficiency within twenty-one days after the later of (a) the date the defendant answered the suit, or (b) the date the report was served. *See id.* If the report is deficient, the trial court may grant the claimant one 30-day extension to cure deficiencies. *Id.* § 74.351(c). "If the claimant does not receive notice of the court's ruling granting the extension until after the 120-day deadline has passed, then the 30-day extension shall run from the date the plaintiff first received the notice." *Id.*

All of the Providers answered the suit on June 9, 2017, and Heinzen timely served Dr. Tasker's curriculum vitae and first expert report on all of the Providers on August 2, 2017. The Providers timely objected, and the trial court held an oral hearing on their objections on December 11, 2017, which was more than 120 days after the Providers answered the suit. Thus, the 30-day extension began to run from the date Heinzen first received notice of the trial court's ruling granting the extension to cure the report's deficiencies as to a given Provider.

The Providers contend that Heinzen received such notice when the trial court orally granted Heinzen's request for an extension at the hearing, and that the trial

5

court improperly granted second and third extensions in January and February 2018. Based on this view of events, the Providers argue that the trial court could not properly consider any of Heinzen's three supplemental reports or Dr. Rushing's curriculum vitae. Heinzen responds that the trial court did not orally grant an extension at the hearing, and that in each of the trial court's three signed orders, it granted a single 30-day extension to supplement her expert report as to a different Provider.

## A.  The Alleged Oral Order of December 11, 2017

In asserting that the trial court granted Heinzen an extension during the oral hearing on their objections, the Providers rely on these two excerpts from the transcript:

> MR. HELLER [Heinzen's counsel]:  Your Honor, of course what we're asking for is if—if you feel that any of the reports as to any specific defendants [is] deficient, we ask—we're requesting a 30-day—
>
> THE COURT:  I will give you the 30 days.
>
> . . .
>
> THE COURT:  So—so I'm going to go ahead and grant the objection and give you 30 days, and I'll—I'll sign the order.

By this language, the trial court did not grant an extension. The trial court instead stated it "*will* give you the 30 days"; that it was "*going to* go ahead and grant the objection" and that it *shall* or *will* "sign the order."[4] When used in the first person, "going to," "shall," and "will" are all verbs in the future tense.[5] Thus, the words the trial court used at the hearing expressed its intention to grant an extension in the future. *Cf. State v. Naylor*, 466 S.W.3d 783, 788 (Tex. 2015) ("A trial court renders

---

[4] "I'll" is a contraction for "I shall" or "I will." NEW OXFORD AMERICAN DICTIONARY 866 (Angus Stevenson & Christine Lindberg eds., 3d ed. 2010).

[5] *See id.* at 742, 1604, and 1977.

judgment orally when it announces rendition as a present act and not as an 'intention to render judgment in the future.'" (quoting *S & A. Rest. Corp. v. Leal*, 892 S.W.2d 855, 857 (Tex. 1995) (per curiam)). The oral statements were ineffective to grant the extension. *See Reese v. Piperi*, 534 S.W.2d 329, 330 (Tex. 1976) (trial court's statements "I have to grant a new trial" and "I will grant it" did not constitute oral rendition but expressed the trial court's intention to render judgment in the future); *Inwood Forest Cmty. Improvement Ass'n. v. Arce*, 485 S.W.3d 65, 71–72 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (trial judge's statement "that she was '*going to grant* the motions to dismiss'" was "ineffective to constitute a ruling"); *see also Lopez v. Brown*, 356 S.W.3d 599, 602–03 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("[T]he notice [of the court's ruling] provided for in section 74.351(c) must be in the form of a written order, rather than a trial court's mere oral pronouncement from the bench."). We therefore reject the Providers' argument that Heinzen had to serve any supplemental expert reports within thirty days after the hearing, and we overrule this part of the Providers' first issue.

## B.    The Signed Orders

The trial court signed two orders on January 24, 2018 ("the January Orders"), each granting a 30-day extension to cure any deficiencies in Dr. Tasker's original August 2018 report. Pursuant to those orders, Heinzen served the Providers on February 23, 2018, with Dr. Tasker's second report and with Dr. Rushing's curriculum vitae and first report. On February 28, 2018, the trial court signed a third order ("the February Order") granting Heinzen another 30-day extension to cure any deficiencies in the original expert report, and in accordance with that order, Heinzen served the Providers on March 30, 2018, with Dr. Rushing's second report. The question is, which materials are included within the scope of our review in

7

determining whether the trial court erred in denying a given Provider's motion to dismiss?

Under the Act, the deadline to serve an expert report is specific to a given Provider. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) ("[A] claimant shall, not later than the 120th day after the date *each* defendant's original answer is filed, serve *on that party* or the party's attorney one or more expert reports, with curriculum vitae . . . for *each* physician or health care provider against whom a liability claim is asserted.") (emphasis added). If the report—that is, the report as to "that party"—is deficient, the trial court may grant a single 30-day extension to cure the deficiency as to "that party." *Id.* § 74.351(c). Thus, in determining whether the trial court erred in denying each Provider's motion to dismiss, we consider (1) the materials served within 120 days of that Provider's answer, and (2) the materials served within thirty days after the trial court signed an order granting Heinzen an extension to cure the initial report's deficiencies as to that Provider.

The first set of materials is the same for all Providers: all of the Providers answered the suit on the same day, and within 120 days, Heinzen served all of the Providers with Dr. Tasker's curriculum vitae and his first report, in which he opined on the conduct of each Provider. In contrast, the supplemental materials included within the scope of our review are different for different providers.

Heinzen contends that the trial court's January Orders granted her a 30-day extension to cure any deficiencies in Dr. Tasker's first report as it pertains to Memorial Hermann and Dr. Whitford, and the February Order granted her a 30-day extension to cure deficiencies in Dr. Tasker's first report with respect to Dr. Lucas. We agree, and that conclusion dictates the scope of our review as to the Providers' appeals of the denials of their respective motions to dismiss.

8

### 1. The supplemental material included in our review of Memorial Hermann's and Dr. Whitford's motions to dismiss consists only of Dr. Tasker's second report, Dr. Rushing's curriculum vitae, and Dr. Rushing's first report.

Of the two January Orders, one states that the trial court considered Memorial Hermann's objections, the response, and the arguments of counsel, and the other states that the trial court considered Dr. Whitford's objections, the response, and the arguments of counsel. By their terms, these orders granted Heinzen thirty days to cure the original report's deficiencies pertaining to Memorial Hermann and Dr. Whitford. If the trial court intended in its January Orders to grant Heinzen an extension to cure the deficiencies in Dr. Tasker's first report with respect to all of the Providers, there would have been no need to sign two orders on the same day, or to sign a total of three orders, each referring to a different Provider.[6]

Because Heinzen served Dr. Tasker's second report and Dr. Rushing's first report and curriculum vitae thirty days after the trial court signed the January Orders, the trial court could properly consider these materials when ruling on Memorial Hermann's and Dr. Whitford's respective objections and motions to dismiss. We therefore overrule Memorial Hermann's and Dr. Whitford's challenge to the timeliness of these reports, and we include them within the scope of our review as to these Providers. Because Dr. Rushing's second report was served after the January Orders' extension expired, we sustain Memorial Hermann's and Dr. Whitford's

---

[6] Although the January Orders are not ambiguous, this result accords with the longstanding rule that when construing an ambiguous judgment, the reviewing court must "adopt the construction that correctly applies the law." *MacGregor v. Rich*, 941 S.W.2d 74, 75 (Tex. 1997) (per curiam) (citing *Gough v. Jones*, 212 S.W. 943, 944 (Tex. Comm'n App. 1919, judgm't adopted)). If one of the January Orders granted Heinzen a 30-day extension to cure the original expert report's deficiencies as to all of the Providers, then the trial court would have incorrectly applied the law in signing the February Order impermissibly granting Heinzen a second thirty-day extension.

challenge to the timeliness of that report, and we do not include it within the scope of our review of the trial court's denials of their motions to dismiss.

### 2. The only supplemental material included in our review of Dr. Lucas's motion to dismiss is Dr. Rushing's second report.

The February Order contains the same language as the January Orders, except that it refers only to Dr. Lucas. Because Heinzen served Dr. Rushing's second report within thirty days after the trial court signed this order, we overrule Dr. Lucas's challenge to the timeliness of that report, and we include it in the scope of our review in determining whether the trial court erred in denying Dr. Lucas's motion to dismiss.

On the other hand, we do not consider Dr. Tasker's second report, Dr. Rushing's curriculum vitae, or Dr. Rushing's first report, because these materials were neither served within 120 days of Dr. Lucas's answer nor served within thirty days after the trial court granted Heinzen an extension to cure deficiencies in the original expert report regarding Dr. Lucas. We sustain Dr. Lucas's challenge to the timeliness of this material, and we do not include it within the scope of our review of the denial of his motion to dismiss.

## IV. DR. WHITFORD'S APPEAL

Dr. Whitford challenges the denial of his motion to dismiss only on the ground that the trial court improperly considered the supplemental material served on February 23, 2018. Because we have concluded that this material was timely served, and Dr. Whitford does not contend the reports are otherwise deficient, we affirm the order denying Dr. Whitford's motion to dismiss.

## V. MEMORIAL HERMANN'S APPEAL

Memorial Hermann contends that Dr. Tasker is unqualified to offer an expert opinion regarding the conduct of the hospital nurses, and that Drs. Tasker and Rushing offer only conclusory statements of causation. When reviewing the trial court's rulings on an expert's qualifications and the adequacy of the expert's report, we apply the abuse-of-discretion standard. *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 811 (Tex. App.—Houston [14th Dist.] 2008, no pet.). A trial court abuses its discretion if it acts without reference to guiding rules or principles such that its ruling is arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). A trial court does not abuse its discretion merely because an appellate justice in similar circumstances would have decided the matter differently. *Id.* at 242.

### A. Dr. Tasker's Qualifications

To be qualified to opine that an institutional health-care provider breached the applicable standard of care, a person must have "knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim" and be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care." TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(2), (b)(3).

Dr. Tasker's curriculum vitae states that he graduated from Temple University School of Medicine in 1969; that he has had a private ophthalmology practice since 1975; and that he has been board-certified in ophthalmology since 1976. He states in his supplemental report that in his last year of medical school, he "was a contracted floor nurse at Temple University School of Medicine for ten weeks full-time." He also states that during his three-year residency from 1970 to 1972, he worked in the emergency rooms of Painesville Memorial Hospital, Kaiser

11

Permanente Hospital of Cleveland, Altman General Hospital of Akron/Canton, and Mt. Sinai Hospital of Cleveland, and that he "became intimately familiar with the minimum standards for emergency room nurses, floor nurses, and staff in hospitals like Memorial Hermann Hospital."

Memorial Hermann challenges Dr. Tasker's qualifications only on the ground that these experiences predate Heinzen's claim by several decades. Memorial Hermann emphasizes that "Dr. Tasker has not practiced as a nurse in 46 years, and he has no current training or experience as a nurse, nor does his report or CV indicate he is familiar with the current requirements of conducting and documenting a nursing triage assessment in 2015."

While it is true that for certain medical-negligence claims against non-physicians, a person is qualified to render an expert report only if the person is or was engaged in a field of health-care practice "that involves the same type of care or treatment as that delivered by the defendant health care provider . . . at the time the testimony is given or . . . at the time the claim arose," that requirement applies only "if the defendant health care provider is an individual." *Id.* § 74.402(b)(1). Because Memorial Hermann is not an individual, this provision does not apply to Dr. Tasker's expert report regarding the care Memorial Hermann provided through its nursing staff. *See, e.g.*, *Harvey v. Kindred Healthcare Operating, Inc.*, __S.W.3d__, No. 14-17-00479-CV, 2019 WL 2063110, *3–4 (Tex. App.—Houston [14th Dist.] May 9, 2019, no pet.) (holding this subsection inapplicable to an expert report addressing a claim against a hospital for its nursing staff's conduct).

Although Memorial Hermann does not dispute that Dr. Tasker's experiences working in emergency rooms and as a floor nurse were sufficient to familiarize Dr. Tasker with the standard of care applicable to emergency-department nurses in the early 1970s, Memorial Hermann offers no argument or authority for its implicit

12

assumption that the knowledge gained from these experiences has somehow expired. A person can be qualified to render an expert opinion about the standard of care applicable to a hospital's nursing staff based on experience acquired years earlier. For example, in *Columbia Valley Healthcare System L.P. v. Zamarripa* ("*Zamarripa I*"), the claimant relied on an expert report by a registered nurse to establish the standard of care applicable to registered nurses staffing a hospital's labor-and-delivery unit. 520 S.W.3d 62, 69–70 (Tex. App.—Corpus Christi-Edinburg 2015) (mem. op.), *rev'd on other grounds* ("*Zamarripa II*"), 526 S.W.3d 453 (Tex. 2017). The defendant hospital objected to the nurse's qualifications, pointing out that she currently practiced in a hematology-and-oncology unit and had last practiced in a labor-and-delivery unit nine years earlier as a licensed vocational nurse. *See id*. at 69. Although the Texas Supreme Court reversed on other grounds, it expressly held that "[t]he trial court was within its discretion to determine that [the nurse's] training as a registered nurse and her prior experience in the labor and delivery unit qualified her to opine on the standard of care." *Zamarripa II*, 526 S.W.3d at 461 n.37.

Applying this reasoning to the present case, we conclude that the trial court did not abuse its discretion in overruling Memorial Hermann's objections to Dr. Tasker's qualifications.

## B.     The Adequacy of Dr. Tasker's Reports

An expert report satisfies the Act's requirements if it "provides a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). Regarding causation, "[a]n expert must explain, based on facts set out in the report, how and why [a health care provider's] breach [of the standard of care] caused the injury. A

13

bare expert opinion that the breach caused the injury will not suffice." *Zamarripa II*, 526 S.W.3d at 459–60 (quoting *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam) (alterations in original)).

In his first report, Dr. Tasker stated that Heinzen's primary complaint in the emergency room was eye pain, and that days passed before a non-party ophthalmologist diagnosed her acute angle-closure glaucoma. Dr. Tasker explained that in acute angle-closure glaucoma, intraocular eye pressure "rises rapidly as a result of relatively sudden blockage of the trabecular meshwork by the iris via papillary block mechanisms." He stated that prolonged elevation of intraocular eye pressure leads to glaucomatous changes in the optic nerve head and loss of optic nerve axons, which in turn leads to a progressive loss of the visual field.

Dr. Tasker related that when Heinzen was in the emergency room, her eye pain was so severe that she rated it as a 10, and the emergency-room nurse gave Heinzen three doses of morphine. Under "primary pain location," the nurse wrote "eye," but the nurse described "the reason for the visit was headache, with the chief complaints of nausea and vomiting for two days, light sensitivity on arrival, and no apparent distress." Dr. Tasker also explained in his first report that if Heinzen had been treated in the emergency room, the damage to her vision likely would have been minimal and reversible, but the damage to her vision increased each hour that her acute angle-closure glaucoma remained untreated.

In his second report, Dr. Tasker stated,

> [It] is critically important for nurses and hospital staff to properly document complaints and patient history accurately and in order of importance. That is true because each successful [sic] healthcare provider who reviews the history and complaints taken down by the emergency room nurses and staff will rely upon that history to make critical decisions. If a nurse makes an error in the order of the history and the importance of the history, successive healthcare providers are

14

likely to rely on that data and make further errors in treatment and diagnosis. . . . [T]he emergency-room nurse breached the standard of care by failing to take a proper history and to indicate the most important item in [Heinzen's] history was eye pain. Instead the nurse focused on headaches. This caused each successive practitioner to focus on headaches rather than eye injuries. Needless wasted time was caused by the emergency room nurses because they failed to take a proper history. The physicians started looking for a head injury and obscure diseases rather than the eye injuries that were presented. The nurses caused a delay in proper diagnosis by the physicians and further caused Donnie Heinzen to suffer acute angle closure for hours and days after it should have been diagnosed, and further caused her permanent eye injuries as a result of the untreated glaucoma.

Memorial Hermann contends that Dr. Tasker's reports insufficiently address causation because he does not explain how a nursing assessment caused the physician defendants to delay making the correct diagnosis, given that "[p]hysicians perform their own assessment and create a differential medical diagnosis after performing their own examination of the patient." Memorial Hermann argues that under the reasoning of *Zamarripa II* regarding causation, Dr. Tasker had to explain how the nurses had the right or the means to persuade the physicians to make a different medical diagnosis.[7]

In *Zamarripa II*, Yolanda Flores was in the third trimester of a pregnancy when she experienced fever, vomiting, abdominal pain, and contractions. 526 S.W.3d at 456. She was taken by ambulance to Valley Regional Medical Center's emergency room, where Dr. Patrick Ellis ordered her transferred to another hospital 159 miles away. *Id.* at 456–57. While en route, Flores began to bleed and went into

---

[7] Memorial Hermann seeks to further support this argument with seven pages of medical records, which it includes in the appendix to its brief. When evaluating the sufficiency of expert reports, however, courts consider only the reports themselves. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). Because the medical records are not part of the expert reports—indeed, they are not even part of the appellate record—we do not consider them or Memorial Hermann's characterization of their contents. *See also* TEX. R. APP. P. 34.1.

cardiac arrest. *See id*. at 457. She died shortly after doctors at the receiving hospital delivered her stillborn child by cesarean section. *See id*.

The guardian of Flores's surviving minor children sued the transferring hospital, among others, and served the expert reports of an obstetrician/gynecologist and of a nurse with labor-and-delivery and emergency-room experience. *See id*. The hospital argued that the expert reports did not adequately show causation. *See id*. The nurse stated in her report that the transferring hospital's nursing staff breached the standard of care by allowing Flores's transfer to a distant hospital while in preterm labor and "by not advocating for" additional treatment, for further investigation of Flores's condition, and for Flores's retention at Valley Regional. *See id*. at 457–58. The obstetrician's expert report stated that the nursing staff's breaches of care "in permitting and facilitating" the transfer caused Flores to be in an ambulance, where an emergency cesarean section and hysterectomy were unavailable, when she began to bleed, and that the bleeding caused her cardiac arrest and death. *See id*. at 458.

Valley Regional argued that the reports failed to show how it caused Flores's death, given that it was the doctor, and not the hospital, who ordered the transfer. *Id*. The Texas Supreme Court agreed, stating that the plaintiff's physician expert "does not explain *how* Valley Regional permitted or facilitated Flores's transfer, or even whether Valley Regional had any say in the matter." *Id*. at 461. The court pointed out that the nurse's expert report does not explain how further investigation of Flores's condition would have averted the transfer, and that neither expert "explain[ed] how Valley Regional had either the right or the means to persuade Dr. Ellis not to order the transfer or to stop it when he did." *Id*.

The facts in this case are distinguishable from those of *Zamarripa*, which dealt with an expert's unexplained assumption that a hospital's nursing staff had the right

16

and ability to persuade a doctor either to refrain from ordering the patient transferred or to revoke the order once issued. In contrast, Dr. Tasker opined that Memorial Hermann's nursing staff omitted relevant information and mischaracterized a patient's primary complaint in medical records on which other health care providers could and did rely, and that this reliance on faulty records contributed to the delay in correctly diagnosing and treating the patient. These circumstances differ from those presented in *Zamarripa*, and more closely resemble the facts in *Abshire v. Christus Health Southeast Texas*, 563 S.W.3d 219 (Tex. 2018) (per curiam).

In that case, the plaintiff Abshire had osteogenesis imperfecta (OI), which causes brittle bones that easily fracture. *See id*. at 221. She presented to the defendant hospital's emergency room with complaints of chest and back pain, and the hospital discharged her with instructions to follow up with a cardiologist. *See id*. at 221 & n.2. Two days later, Abshire was back, and although her OI was noted, the physician ordered only a chest x-ray before releasing her. *Id.* at 221. She returned the next day complaining of pain in her shoulder, neck, back, and chest. Hospital staff again documented Abshire's history of OI and discharged her with diagnoses of constipation, musculoskeletal pain, and pleurisy, which is an inflammation of the lungs. *See id*. at 221 & n.4.

Six days later, Abshire was taken by ambulance to the same emergency room, again complaining of chest and back pain. She remained hospitalized for three days and a second chest x-ray was taken, but throughout this time, her OI was not documented in her chart. *Id.* at 221. The day after the hospital discharged her, she returned to the emergency room with complaints of weakness in her legs. *Id.* at 222. She was transferred to a rehabilitation facility, with continuing complaints of pain and severe weakness, which now were accompanied by bowel and bladder incontinence. *See id.* Abshire was sent back to the same hospital for further

17

evaluation and once more was medically cleared. *Id.* at 222. When the hospital again tried to send Abshire to the rehabilitation facility, a doctor there intervened and had her transferred to another hospital. *See id*. There, doctors ordered an MRI and discovered a compression fracture in a thoracic vertebrae, and the injury to Abshire's spinal cord from the untreated fracture rendered her paraplegic and incontinent. *See id.*

In Abshire's suit against the original hospital, her expert opined that the nursing staff failed to consider the patient's prior relevant medical history and ignored signs of spinal injury so that they instead focused on a possible cardiac problem as the source of Abshire's symptoms. *See id*. at 224. The expert explained that these breaches of the standard of care caused delay in diagnosing and treating the compression fracture, which in turn led to Abshire's paralysis and incontinence. *See id.*

The Texas Supreme Court held that the expert report sufficiently addressed causation by "draw[ing] a line directly from the nurses' failure to properly document Abshire's OI and back pain, to a delay in diagnosis and proper treatment (imaging of her back and spinal fusion), to the ultimate injury (paraplegia)." *Id.* at 225. The intermediate court of appeals had held that the opinion suffered from an analytic gap in that doctors did not order tests or provide spinal treatment even on those occasions when Abshire's OI was noted in the record. *See id.* The Texas Supreme Court rejected that view, stating, "it appears the court of appeals simply did not agree with [the expert's] conclusions in light of Abshire's overall course of treatment," but "the court's disagreement with the expert's opinion does not render the expert report conclusory." *Id.* at 226.

Just as the expert report in *Abshire* drew a line of causation from the nursing staff's failure to properly document the patient's relevant medical history to the

delay in diagnosis and treatment and thence to the resulting injury, so too do Dr. Tasker's reports causally link the failure of Memorial Hermann's nursing staff to properly document Heinzen's primary complaint, to the delay in her diagnosis and treatment, and then to her resulting vision loss.

We conclude that the trial court did not abuse its discretion in overruling Memorial Hermann's objection that Dr. Tasker's reports were conclusory on the causation issue. Thus, without deciding whether Dr. Rushing's report similarly supports Heinzen's claims against the hospital, we affirm the order denying Memorial Hermann's motion to dismiss.

## VI. DR. LUCAS'S APPEAL

Dr. Lucas challenges the qualifications of Drs. Tasker and Rushing and argues that the reports of both experts fail to adequately address the standard of care, breach, and causation. Because we conclude that Dr. Tasker was qualified to opine that Dr. Lucas's breach of the applicable standard of care caused Heinzen's vision loss, and that his opinion satisfied the statutory requirements, we need not consider Dr. Lucas's issues concerning Dr. Rushing.[8]

### A.    Qualifications

The qualifications necessary to author an expert report in a medical-negligence claim against a physician are described in the Act as follows:

(a)    In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

---

[8] As previously discussed, the scope of our review of Dr. Lucas's appeal includes Dr. Tasker's first report and curriculum vitae and Dr. Rushing's second report, but does not include Dr. Tasker's second report, Dr. Rushing's first report, or Dr. Rushing's curriculum vitae.

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

. . .

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and

(2) is actively practicing medicine in rendering medical care services relevant to the claim.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.401.

When determining whether the person meets these qualifications, we look only to the four corners of the expert report and the curriculum vitae. *Methodist Hosp. v. Addison*, 574 S.W.3d 490, 503–04 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 758 (Tex. App.—Houston [14th Dist.] 2007, no pet.)). These materials must establish the expert's knowledge, skill, experience, training, or education regarding the specific issue before the court. *Id.* at 504 (citing *Baylor Coll. of Med. v. Pokluda*, 283 S.W.3d 110, 118–19 (Tex. App.—Houston [14th Dist.] 2009, no pet.)).

Dr. Lucas contends that Dr. Tasker is not qualified to render an expert opinion regarding the claims against Dr. Lucas because Dr. Tasker was not actively practicing emergency medicine at the time the claim arose or at the time of his report.

20

To clarify the required qualifications, an expert must know the "accepted standards of medical care for the diagnosis, care, or treatment *of the illness, injury, or condition* involved in the claim." TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a)(2) (emphasis added). By its plain language, the statute does not focus on the defendant doctor's area of expertise, but on the condition involved in the claim. *See Blan v. Ali*, 7 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 1999, no pet.). As previously mentioned, a witness providing an expert report concerning a non-physician individual must be "practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider . . . at the time the testimony is given or was practicing that type of health care at the time the claim arose," TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(1), but the provision governing qualifications to issue an expert report concerning a physician does not contain this language. *See id*. § 74.401.

The "illness, injury, or condition" involved in Heinzen's claim is acute angle-closure glaucoma. Thus, to offer an expert opinion, Dr. Tasker must be "qualified on the basis of training or experience to offer an expert opinion regarding *those* accepted standards of medical care," that is, "the accepted standards of medical care for the diagnosis, care, or treatment" of acute angle-closure glaucoma. *See id*. § 74.401(a)(3) (emphasis added). And to determine whether Dr. Tasker is qualified on the basis of training or experience to offer an expert opinion on the standards of care for the diagnosis, care, or treatment of acute angle-closure glaucoma, the trial court was required to consider whether, at the time the claim arose or at the time he authored the reports, Dr. Tasker had substantial training and experience in "an area of medical practice relevant to the claim" and was actively practicing medicine in rendering medical care services "relevant to the claim."

21

Dr. Tasker is board-certified in ophthalmology, and Dr. Lucas does not dispute that Dr. Tasker knows the accepted standards of medical care for the diagnosis, care, or treatment of acute angle-closure glaucoma; Dr. Lucas instead asserts that Dr. Tasker failed to demonstrate any experience, training, or education in emergency medicine. But Dr. Tasker stated in his report, "I *currently* care for patients with similar conditions as Ms. Donnie Heinzen and in hospital facilities similar to Memorial Hermann emergency room"[9] and "[t]he standard of care that applies to the care I provide, applies in an identical manner to that of Memorial Hermann Hospital emergency room." He further stated,

> I am qualified to have an opinion on the standard of care of any and all physicians who treat patients who have ophthalmologic emergencies, ophthalmologic diseases, and conditions, as every medical doctor who specializes in the field of ophthalmology and who treats such patients as Ms. Heinzen. Also, I have a fundamental knowledge of the effects of misdiagnosis and the inability to recognize the ophthalmologic emergency condition of angle closure glaucoma. I know and understand how to do an ophthalmologic examination on a patient like Ms. Heinzen and how to emergency [sic] conditions such as angle closure glaucoma and how to follow patients like Ms. Heinzen during and after angle closure glaucoma. I am qualified to have an opinion on the standard of care of emergency room physicians presented with an ophthalmologic emergency such as angle closure . . . , as they should have been trained on what actions to take and how to diagnose and treat a patient with angle closure glaucoma who presents to the hospital with severe eye pain, severe visual loss in both eyes, headache, red eyes, conjunctiva swelling, nausea, and vomiting such as Ms. Heinzen.

Given these statements, we cannot say that the trial court abused its discretion in concluding that Dr. Tasker is qualified to render an expert opinion concerning Heinzen's claims against Dr. Lucas.

---

[9] Emphasis added.

22

**B.     Adequacy of the Report**

Dr. Lucas also contends that Dr. Tasker's expert reports fail to adequately address the applicable standard of care, breach, and causation. Because the same excerpts from Dr. Tasker's first report address both the standard of care and breach, we address those alleged deficiencies together.

### 1.     *The Standard of Care and Breach*

According to Dr. Lucas, Dr. Tasker opines that the standard of care requires that an emergency-room physician (1) must recognize angle-closure glaucoma, (2) must not misdiagnose angle-closure glaucoma as some other condition, (3) must call or refer the patient to an ophthalmologist for emergency treatment, and (4) must treat angle-closure glaucoma to lower intraocular pressure to avoid vision loss. Dr. Lucas argues that Dr. Tasker's reports are deficient in that he does not state how an emergency-room physician is to avoid misdiagnosis; how or why the physician is to recognize angle-closure glaucoma; why the physician must call or refer the patient to an ophthalmologist for emergency treatment; or how the physician must lower intraocular pressure.

#### (a)     Failure to Correctly Diagnose, or to Transfer for Diagnosis

Dr. Lucas's arguments are based solely on Dr. Tasker's second report, which we do not consider, but the standard of care applicable to an emergency-room physician and the breach of that standard were addressed in Dr. Tasker's first report. There he wrote,

> The standard of care is clear for the history, examination, testing, diagnosis, and treatment of the ophthalmologic emergency of angle closure glaucoma. It should be recognized by any emergency room staff, emergency room physician, and of course an ophthalmologist. Acute angle closure, as with Ms. Heinzen[,] is clear when one presents with blurring of vision, painful red eye, headache, nausea, and

23

vomiting. Diagnosis is made by testing for high intraocular pressure (IOP), corneal edema, shallow anterior chamber, and a closed angle on gonioscopy. Medical or surgical therapy is directed at widening the angle and preventing further angle closure. The pressure must be lowered or the patient [sic] peripheral vision loss will occur due to the destruction of the nerve fiber layer and optic nerve. . . . A typical history of angle closure includes reduced vision, eye redness, corneal edema, engorged conjunctival vessels, halos around lights, aching eye or brow pain, and headache. Here, Ms. Heinzen presented with severe eye pain in both eyes, severe visual loss, headache, redness, conjunctiva swelling, tearing, light sensitivity, a hazy cornea and nausea and vomiting. These signs and symptoms are classic for angle closure glaucoma and high intraocular pressure. These alone should have made the emergency room doctor and ophthalmologist think to rule out angle closure glaucoma. If properly examined[,] reduced acuity, a closed angle upon gonioscopy, high intraocular pressure, corneal edema, a fixed dilated pupil, and engorged conjunctival vessels are typically found. Dr. Lucas should have been able to diagnose Ms. Heinzen as presenting with angle closure glaucoma. Proper examination was not done by Dr. Lucas. . . .

It is imperative that a thorough ophthalmologic examination is done by an emergency room physician or ophthalmologist. If these tests cannot be done at the presenting hospital, the patient should be immediately transferred to a hospital or facility with the ability to assess, test, diagnose, and treat the patient. A thorough ophthalmologic examination is not documented in the medical record by Dr. Lucas on the date of Ms. Heinzen's presentation to the emergency room. A slit lamp exam, gonioscopy examination, and perimetry were never done. There is no documentation that an intraocular pressure was ever done. . . . Without an intraocular pressure being taken one would never even know if the intraocular pressure was high or suspect angle closure glaucoma. Not doing an accurate ophthalmologic examination in a timely fashion is below the standard of care. Not recognizing the typical signs and symptoms of angle closure and ophthalmologic emergency is below the standard of care.

If properly diagnosed upon presentation dynamic gonioscopy, oral carbonic anhydrase inhibitors and or topical beta blocker and or topical alpha 2 agonist, topical cholinergic agonists, hyperosmotic

agents and of course laser peripheral iridotomy after the acute attack is resolved and corneal edema resolves should be done.

. . .

First tests to order after the history and exam reveals symptoms of angle closure glaucoma:

- Gonioscopy:

    Definitive test for diagnosing angle closure; gonioscopy of both eyes should be performed on all patients in whom angle closure is suspected.[10] It should also be performed prior to instilling dilating medications to rule out eyes susceptible to angle closure.

    . . . .

    Gonioscopy may be therapeutic in breaking the attack of acute angle closure.

    Result: TM is not visible in angle closure because the peripheral iris is in contact with it.

    Dr. Lucas . . . did not do this test.

- Slit lamp examination:

    The best method of examining the optic disc is with the slit lamp combined with a high magnification posterior pole lens. The anterior chamber depth should be noted and the size of the phakic lens.

    Result: shallow anterior chamber; and signs of glaucoma: large optic cup, narrowing of the neuroretinal rim, splinter hemorrhage, nerve fiber loss.

    This was not documented as done by Dr. Lucas . . . .

- Automatic static perimetry:

    Identifies the presence, and quantifies the amount, of glaucomatous visual field loss during initial diagnosis and subsequently during follow-up care.

    Result: visual field defects

---

[10] Dr. Tasker explained elsewhere in his report, "Gonioscopy enables the health care provider to view the anterior chamber angle so as to evaluate the angle structures."

This was not done by Dr. Lucas. . . .

As Dr. Tasker stated, the standard of care requires an emergency room physician to recognize that "severe eye pain in both eyes, severe visual loss, headache, redness, conjunctiva swelling, tearing, light sensitivity, a hazy cornea and nausea and vomiting" are "classic" symptoms of acute angle-closure glaucoma. He further explained that when a patient presents with such symptoms, acute angle-closure glaucoma must be diagnosed or ruled out by performing gonioscopy, a slit lamp examination, and automatic static perimetry. Gonioscopy is the "[d]efinitive test for diagnosing angle closure," and "may be therapeutic in breaking the attack." He also stated that the emergency-room physician must view the optic disc and note the depth of the anterior chamber and the size of the phakic lens by performing a slit lamp examination and must additionally identify and quantify any glaucomatous visual field loss by ordering or performing automatic static perimetry. Having identified the symptoms suggesting acute angle-closure glaucoma and the diagnostic tests required by the standard of care, Dr. Tasker added that if the hospital could not perform the tests, then the standard of care required the emergency-room physician have the patient transferred to a facility that could do so. He opined that Dr. Lucas did none of these things.

We accordingly conclude that Dr. Tasker sufficiently (i) identified the reasons that Dr. Lucas would have recognized acute angle-closure glaucoma if he had adhered to the standard of care, and (ii) described how Dr. Lucas's breach of the standard of care delayed Heinzen's correct diagnosis and treatment.

### (b) Failure to Treat, or to Transfer for Treatment

Dr. Lucas also contends that Dr. Tasker's reports are deficient in that he opines that the standard of care required an emergency-room physician in the circumstances presented here to call or refer the patient to an ophthalmologist and

26

to treat angle-closure glaucoma to lower intraocular pressure, but he does not say why an ophthalmologist must be called or how the condition must be treated.

In support of these arguments, Dr. Lucas again cites only Dr. Tasker's inapplicable second report, but the treatment required by the standard of care and the role of an ophthalmologist are detailed in Dr. Tasker's first report:

> Once diagnosed, the initial intervention includes acetazolamide, a topical beta-blocker, and a topical steroid. Acetazolamide should be given as a stat dose of 500 mg IV followed by 500 mg PO. A dose of a topical beta-blocker (i.e., carteolol, timolol) will also aid in lowering IOP [intraocular pressure]. Beta-blockers and acetazolamide decrease aqueous humor production and help to open the angle. An alpha-agonist can be added for a further decrease in IOP. Inflammation causes the pathophysiology and presenting symptoms. Topical steroids are used to decrease the inflammatory reaction and reduce optic nerve damage. The current recommendation is for 1-2 doses of topical steroids. . . . Analgesics for pain and antiemetics for nausea and vomiting can increase IOP beyond its already elevated level. Ms. Heinzen was given antiemetics and pain medication which would have typically increased the intraocular pressure. Placing the patient in the supine position may aid in comfort and reduce IOP. This was not done. It is also believed that, while supine, the lens may fall away from the iris decreasing pupillary block. After the initial intervention, the patient should be reassessed. Reassessment includes evaluating IOP, evaluating drops, and considering the need for further intervention, such as osmotic agents and immediate iridotomy. . . .

> Approximately 1 hour after beginning treatment, pilocarpine, a miotic that leads to opening of the angle, should be administered every 15 minutes for 2 doses. In the initial attack, the elevated pressure in the anterior chamber causes a pressure-induced ischemic paralysis of the iris. At this time, pilocarpine would be ineffective. During the second evaluation, the initial agents have decreased the elevated IOP and hopefully have reduced the ischemic paralysis so pilocarpine becomes beneficial in relieving pupillary block. This standard of care treatment [sic] was not provided due to the fact that no one in the emergency room (Dr. Lucas . . .) . . . did not [sic] recognize, diagnose, or treat for angle closure glaucoma.

27

. . . .If the intraocular pressure is not reduced 30 minutes after the second dose of pilocarpine, an osmotic agent must be considered. An oral agent like glycerol can be administered in nondiabetics. Ms. Heinzen is diabetic so oral isosorbide could be used to avoid the risk of hyperglycemia associated with glycerol. Patients who are unable to tolerate oral intake or do not experience a decrease in intraocular pressure despite oral therapy are candidates for intravenous mannitol to lower the pressure. This was not done by Dr. Lucas . . . .

When medical therapy proves to be ineffective, corneal indentation (CI) can be used as a temporizing measure to reduce IOP until definitive treatment is available. As the cornea is indented, aqueous humor is displaced to the periphery of the anterior chamber, which serves to temporarily open the angle. This leads to immediate reduction of IOP and occasionally may completely abort the attack. After applying topical anesthetic, any smooth instrument can be used to perform this procedure, including a gonioprism (ideal, if available), or a cotton-tipped applicator. Obviously, a concern with performing CI is the possibility for damage to the corneal epithelium, which may complicate the patient's course.

Laser peripheral iridotomy or LPI, performed 24-48 hours after IOP is controlled, is the standard of care therapy and considered the definitive treatment for angle closure glaucoma. . . . Lens extraction may also be considered by some to help reduce the intraocular pressure if cataracts may be blocking the angle.

The ophthalmologist should decide after testing including gonioscopy with complete visualization and inspection of the angle which therapy will be most beneficial to the patient. If ophthalmologic consultation is not immediately available, the standard of care is that the emergency department physician must begin pharmacologic therapy as described previously above. Therapy should reduce intraocular pressure and ophthalmologic evaluation must be quickly obtained either within the emergency room or by transferring the patient to a facility or emergency room with an ophthalmologist who can immediately treat the patient. If the IOP is unchanged or increased, with appropriate pharmacologic therapy, a laser iridotomy must be done immediately. Because outcome is adversely affected by the duration of symptoms, expeditious evaluation by an ophthalmologist is required. Ocular massage through a closed eyelid may be performed

while waiting for ophthalmology if no other treatment reduces IOP. None of this was done by the emergency room doctors . . . .

We conclude that Dr. Tasker not only adequately explained the role of an ophthalmologist, but also sufficiently described the care that an emergency-room physician must render while awaiting an ophthalmologist's evaluation, and which Dr. Lucas failed to perform.

## 2. *Causation*

Dr. Tasker opined that if Heinzen had been properly treated in the emergency room, the damage to her vision likely would have been minimal and reversible, and that the damage to her vision increased each hour that her acute angle-closure glaucoma remained untreated. Dr. Lucas contends that this causation opinion is deficient in that Dr. Tasker does not state how Dr. Lucas should have treated Heinzen and how that treatment would have stopped or reversed the damage.

Here, too, Dr. Lucas's arguments rely solely on the content of Dr. Tasker's second report, but as we have just seen, Dr. Tasker's first report details the treatment Dr. Lucas should have provided. Dr. Tasker further explained how the delay in diagnosis and treatment allowed the damage to Heinzen's eyes to progress:

> Angle-closure glaucoma (ACG) may be reversible and may be caused by mechanical blockage or by adhesions called synechia which close the anterior-chamber angle. The angle closure may occur in an acute or chronic form. In the acute form, the IOP rises rapidly as a result of relatively sudden blockage of the trabecular meshwork by the iris via papillary block mechanism. The chronic form may develop after acute angle closure where synechial closure of the angle persists, or it may develop over time as the angle closes from prolonged or repeated contact between the peripheral iris and the TM, which often leads to peripheral anterior synechiae (PAS) and functional damage to the angle. Time is of the essence. . . . It is well known that prolonged elevation of intraocular pressure leads anatomically to glaucomatous changes in the optic nerve head and loss of optic nerve axons and leads

to a progressive loss of the visual field. This is what happened in all medical probability to Ms. Heinzen.

. . .

Ms. Heinzen's ocular status began to deteriorate from the time she arrived in the emergency room until days later when she was finally seen by Dr. Wycoff. In my opinion, earlier intervention (proper diagnosis and treatment) in all of these areas would have in medical probability have [sic] saved her peripheral vision, optic nerve, nerve fiber layer, and other such ocular damage. . . . The patient kept getting worse and the eye pain and ocular symptoms got worse. . . . No one addressed the fact that Ms. Heinzen's conditioning was worsening . . . .

As with the physician's expert report in *Abshire*, Dr. Tasker's report in this case draws a line directly from Dr. Lucas's breach of the standard of care, to the delay in diagnosis and treatment, and thence to the ultimate injury. *See Abshire*, 563 S.W.3d at 225. We conclude that Dr. Tasker's reports satisfied the statutory requirements, and we overrule Dr. Lucas's second issue.

## VII. CONCLUSION

Having affirmed the trial court's overruling of the Providers' dispositive objections to Dr. Tasker's first and second expert reports, we affirm the denial of the Providers' respective motions to dismiss.


/s/     Tracy Christopher
Justice


Panel consists of Justices Christopher, Hassan, and Poissant.

30